## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BOBBI-JO ISENBERG,<br>            Plaintiff<br><br>        v.<br><br>STATE FARM FIRE AND CASUALTY<br>COMPANY,<br>            Defendant | CIVIL ACTION NO. 2:21-cv-01147 |

## <u>ORDER</u>

AND NOW this _____ day of _____, 2022, upon consideration of Defendant, State Farm Fire and Casualty Company's Motion to Compel Plaintiff's deposition, and good cause appearing pursuant to Federal Rule of Civil Procedure 37 and LCvR 37.1 and LCvR37.2, it is hereby **ORDERED** and **DECREED** that said Motion is **GRANTED.** Plaintiff shall provide full and complete deposition answers, including answers to questions previously asked at the deposition which Plaintiff was instructed not the answer by her counsel.  Plaintiff and her counsel shall allow counsel for the Defendant to continue with and complete the deposition without further inference and instruction not to answer from Plaintiff's counsel

**BY THE COURT:**

_____
                                            J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BOBBI-JO ISENBERG,<br>             Plaintiff<br><br>       v.<br><br>STATE FARM FIRE AND CASUALTY<br>COMPANY,<br>             Defendant | CIVIL ACTION NO. 2:21-cv-01147 |

**DEFENDANT'S MOTION TO COMPEL PLAINTIFF'S**
**DEPOSITION TESTIMONY**

Defendant, State Farm Fire and Casualty Company (hereinafter "Defendant"), by its undersigned counsel, hereby moves the Court to enter an Order compelling Plaintiff, Bobbi-Jo Isenberg (hereafter "Plaintiff"), to attend a deposition and fully and completely answer all questions and, in support thereof, avers as follows:

1.     This civil action arises out of an insurance claim relating to damages to Plaintiff's property.

2.     Plaintiff's Complaint avers that on or about May 13, 2020, a fire completely destroyed Plaintiff's home as well as all of the personal property, and Plaintiff made a claim under a Homeowners Insurance Policy.

3.     Defendant rescinded the subject Homeowners Insurance Policy. Also, Defendant determined that there would be no coverage for the claim because the property was not owner occupied as a residence premises.

4.     In her Complaint, Plaintiff seeks recovery of: (a) contractual property damage benefits; and (b) extra-contractual damages under the Pennsylvania Bad Faith Statute, 42 Pa. Cons. Stat. § 8371 in connection with the handling and adjustment of her contractual claims.

5.      The deposition of Plaintiff was conducted on January 12, 2022 in advance of the January 28, 2022 Mediation session with David B. White, Esquire, however, the deposition was adjourned due to repeated disruptions from counsel for the Plaintiff and instructions to his client not to answer.

6.      The completion of the deposition of the Plaintiff is necessary to the defense of this case.

7.      During the deposition, counsel for the Defendant, State Farm, sought to obtain information regarding the Plaintiff and the subject property including, *inter alia*: (a) documents related to Plaintiff's rental property charges and payments in January 2020; (b) funding source for the purchase of the subject property; (c) the finishes of rooms of the subject property; (d) renovations/repairs of the subject property completed prior to the fire; (e) the identity of individuals or entities that completed renovations/repairs of the subject property prior to the file including names, addresses and information regarding construction background; (f) the identity and location of the school the Plaintiff's minor children attended prior to and after the fire; (g) the scope of a PFA Order; and (h) the presence of Plaintiff and others at the subject property on the day of the loss.  See true and correct copy of relevant pages from the Notes of Testimony of Plaintiff, dated January 12, 2022 attached hereto as Exhibit "A", including pp. 42, 53, 64-66, 68, 86, 95-96, 115, 142-145, 147, 161-162,164-165 and 167.

8.      In response to counsel for the Defendant's questions, counsel for the Plaintiff objected on grounds that the questions were asked in a pre-litigation examination under oath[1] and

---

[1] The United States District Court for the Eastern District of Pennsylvania has observed that "it is common practice for insurers to require sworn statements in support of insurance claims" *Kubrick v. Allstate Ins. Co. (In re Estate of Kubrick)* Civ. A. No. 01-6451, 2004 U.S. Dist. LEXIS 358 at *42 n. (E.D. Pa. Jan. 7, 2004) *citing O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 903 n. 4 (An examination under Oath, customary in the insurance industry, is akin to a deposition only to the extent that the insured is questioned by the insurer, under threat of perjury, regarding the circumstances of the loss. . .)

were, therefore, asked and answered and not relevant.  Counsel for the Plaintiff further instructed

the witness not to answer the questions and advised that he would continue to make the same

objection and instruct his client not the answer. See Exhibit "A", pp. 42, 53, 65, 66, 68, 86, 95,

96, 115, 142, 143 147, and 165.

9.      The objections and instructions not to answer prevented inquiry into subjects that

are at in this matter including the subject property and the actions of the Plaintiff.

10.      Additionally, the objections and instructions not to answer were disruptive to the

deposition process and prevented counsel for the Defendant from completing the deposition as

scheduled.

11.      Rule 30 governs oral depositions and provides, in pertinent part, that:

(c)      <u>Examination and Cross-Examination; Record of the Examination; Objections:
         Written Questions</u>

                     . . .              . . .              . . .

         (2)      Objections.  An objection at the time of the examination—whether to
         evidence, to a party's conduct, to the officer's qualifications, to the manner of
         taking the deposition, or to any other aspect of the deposition—must be noted on
         the record, but the examination still proceeds; the testimony is taken subject to
         any objection.  An objection must be stated concisely and in a non-argumentative
         and non-suggestive manner. A person may instruct a deponent not to answer only
         when necessary to preserve a privilege, to enforce a limitation directed by the
         court, or to present a motion  or to present a motion under Rule 30(d) (3)[to
         protect the deponent or party from annoyance, embarrassment, or oppression].

Fed. R. Civ. P. 30(c)(2).

12.      Further the Notes of Advisory Committee on Rules—1993 provide "[d]irections

to a deponent not to answer a question can be even more disruptive than objections. The second

sentence of new paragraph (1)[2] prohibits such directions except in the three circumstances

---

[2]  The Rules have since been renumbered the provisions originally set forth at subdivision (d) paragraph (1) now
appear in subdivision (c) paragraph 2.

indicated: to claim a privilege or protection against disclosure (*e.g.*, as work product), to enforce a court directive limiting the scope or length of permissible discovery, or to suspend a deposition to enable presentation of a motion under paragraph (3)."

13.     Courts of this circuit have held instructions not to answer are improper where they do not fall into any of the three valid reasons, set forth in Rule 30, namely; when necessary to preserve a privilege, to enforce a limitation ordered by court or to present a motion under Rule 30(d)(3). *See Plaisted v. Geisinger Med. Ctr.*, 210 F.R.D. 527,534  (M.D. Pa. Oct. 15, 2002) (Observing instructions not to answer are limited to those situations where counsel is protecting a privilege, enforcing a court-imposed limitation or preparing to present a protective motion and permitting second deposition in those areas where counsel refused to allow witness to answer questions) and *Armstrong ex rel. United States v. Subacute*, Civ. A. No. 2:12-cv-3319, 2020 U.S. Dist. LEXIS 1569 at *6 (D.N.J. Jan. 6, 2020)(holding instruction not to answer during deposition was improper where it did not fall into any of the three bases for such an instruction under Rule 30©(2).

14.      Pursuant to Fed. R. Civ. P. 37(a)(3)(i) (B) and (a)(4) if "a deponent fails to answer a question asked under Rule 30*,*" or provides an answer that is "evasive or incomplete," then a motion to compel the deposition testimony may be filed.

15.     "When taking an oral deposition, the party asking a question may complete or adjourn the examination before moving for an Order".  Fed. R. Civ. P. 37(a)(3)(c).

16.     "If the motion is granted . . . the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A).

17.     All phases of the [deposition] examination are subject to the control of the court, which has discretion to make any orders necessary to prevent the abuse of the discovery and deposition process.  *See* 8 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure §§2213, 21165 (1971).*

18.     The objections and instructions not to answer of counsel for the Plaintiff do not fall within the valid categories set forth in Rule 30.

19.     The objections and instructions not to answer of counsel for the Plaintiff prevented inquiry into subjects that are in this matter including the subject property and the actions of the Plaintiff.

20.     Additionally, the objections and instructions not to answer of counsel for the Plaintiff where disruptive and prevented counsel for the Defendant from completing the deposition as scheduled.

WHEREFORE, Defendant, State Farm Fire and Casualty Company, respectfully requests that the Court enter an Order Compelling the Plaintiff to provide full and complete deposition answers and allow counsel for the Defendant to continue with and complete the deposition without further inference from Plaintiff's counsel.

Respectfully submitted,

Date:   January 24, 2022

YKD/5461
Yolanda Konopacka DeSipio
Michael A. Weiner
Attorney ID No. 62170/93640
BENNETT, BRICKLIN & SALTZBURG LLC
960 Harvest Drive
Building B, Suite 100
Blue Bell, PA 19422
desipio@bbs-law.com
(267) 654-1116
(Counsel for Defendant)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BOBBI-JO ISENBERG,
    Plaintiff

   v.

STATE FARM FIRE AND CASUALTY
COMPANY,
    Defendant

CIVIL ACTION NO. 2:21-cv-01147

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that the foregoing Motion to Compel against Plaintiff was forwarded to

the following counsel of record via email to:

     Wheeler DiUlio & Barnabei, P.C
     Vincent Doto, Esquire
     vdoto@wdblegal.com
     One Penn Center - Suite 1270
     1617 JFK Boulevard
     Philadelphia, PA 19103


       BY: YKD/5461_____
         YOLANDA KONOPACKA DESIPIO, ESQUIRE
         Attorneys for Defendant
         Attorney ID No: 62170
         BENNETT, BRICKLIN & SALTZBURG LLC
         960 Harvest Drive
         Building B, Suite 100
         Blue Bell, PA 19422
         (267) 654-110

Date: January 24, 2022

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BOBBI-JO ISENBERG, | ) | DEPOSITION UPON |
| Plaintiff, | ) | |
| | ) | ORAL EXAMINATION |
| - vs - | ) | |
| | ) | OF |
| STATE FARM FIRE AND | | |
| CASUALTY COMPANY, | ) | |
| Defendant. | ) | BOBBI-JO ISENBERG |

------------------------

TRANSCRIPT OF DEPOSITION, taken by and before

ADRIENNE SMITH, Professional Court Reporter and Notary

Public, via Zoom Video Conferencing, on Wednesday,

January 12, 2022 commencing at 10:03 a.m.

- - -

ERSA COURT REPORTERS

30 South 17th Street

United Plaza - Suite 1520

Philadelphia, PA  19103

(215) 564-1233

BOBBI-JO ISENBERG

2

1

2

3

4

5  A P P E A R A N C E S:

6

7

8      WHEELER, DiULIO & BARNABEI, P.C.

9      BY:  VINCENT J. DOTO, ESQ.

10      One Penn Center

11      Suite 1270

12      1617 JFK Boulevard

13      Philadelphia, PA 19103

14      (215) 971-1000

15      Attorney for the Plaintiff

16

17

18      BENNETT, BRICKLIN & SALTZBURG, LLC.

19      BY:  YOLANDA KONOPACKA DeSIPIO, ESQ.

20      Centre Square West Tower

21      1500 Market Street

22      32nd Floor

23      Philadelphia, PA 19102

24      (215) 561-4300

25      Attorney for the Defendant

BOBBI-JO ISENBERG

3

```
 1                    I N D E X
 2   WITNESS                                      PAGE
 3   BOBBI-JO ISENBERG
 4      By:  Ms. Yolanda Konopacka DeSipio          4
 5                     - - -
                   E X H I B I T S
 6
 7   NUMBER              DESCRIPTION             PAGE
 8   Isenberg 1     Housing Authority Lease        29
 9   Isenberg 2     Tenant Balance Listing         41
10   Isenberg 3 GNC Community Federal Credit Union   157
11
                   R E Q U E S T S
12
     DESCRIPTION                               PAGE
13
     Request of reservation of rights to redepose
14
     Plaintiff                                   41
15
16          R U L I N G   Q U E S T I O N S
17   PAGE          LINE          PAGE      LINE
18    42            7            53        12
      65           20            66        17
19    68            2            68         9
      68           13            85        25
20    86           15            86        19
      95           13            95        21
21    96            2           142         1
     142            5           142        12
22   143            7           143        15
     144           15           145         1
23   145            4           145         7
     147            5           147        18
24   161           21           161        25
     164           13           164        19
25   164           23           165         3
     165            9
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

BOBBI-JO ISENBERG

4

1                    (By agreement of counsel, the

2     signing, sealing, filing and certification of the

3     transcript has been waived; and all objections, except

4     as to the form of the question, have been reserved

5     until the time of trial.)

6                    BOBBI-JO ISENBERG, having been duly

7     sworn, was examined and testified as follows:

8     BY MS. KONOPACKA DeSIPIO:

9     Q.         Good morning, Ms. Isenberg.  My name is

10    Yolanda DeSipio and I represent State Farm Fire &

11    Casualty Company in the lawsuit that you had filed

12    through your attorneys against them.  I will be taking

13    your deposition today.  We are doing this deposition

14    virtually and I just wanted to find out, where are you

15    physically located for this deposition?

16    A.         I am where I work in Zelienople,

17    Pennsylvania.

18    Q.         And what is the address there?

19    A.         I'm not too sure.  Not sure of the physical

20    address.  I just know it's Jackson Township,

21    Zelienople, Pennsylvania.

22    Q.         Jackson Township.  And again, say where is

23    that.

24    A.         Zelienople, Pennsylvania.

25    Q.         Can you spell that for me?

BOBBI-JO ISENBERG

41

1   world; from Ireland.  I've had Fenton.  I've had

2   Ridgeware.  Just so many things that were handed down

3   to me and things that I personally collected on my own

4   and I don't remember everything.

5   Q.          When you have that list put together and

6   you get it to your attorney, I'm just going to reserve

7   the right to re-depose you concerning that list.  Let

8   me show you another document that was provided to me.

9   A.          Okay.

10  Q.          Ms. Isenberg, can you see the next document

11  that I put up on the screen?

12  A.          Yes.

13              MS. KONOPACKA DeSIPIO:  And this

14  document we will mark as Isenberg No. 2.

15  Q.          And at the top the document is titled,

16  "Tenant Balance Listing - Detail."  And then if you go

17  over to the far right-hand side at the top it says,

18  "LCHA Public Housing (L001.)  Do you see that?

19  A.          Yes.

20  Q.          And the date period on here it says,

21  "01/01/2020 to 8/19/2020."  Do you see that?

22  A.          01/01/2020.  Okay.  Yes.

23  Q.          Do you know where this document came from?

24  A.          Lawrence County Housing Authority.

25  Q.          Did you request this document?

BOBBI-JO ISENBERG

```
 1    A.          I don't know.

 2    Q.          And if we look here starting January 1st

 3    2020 it shows there was a charge of $198.00 and then

 4    on January 8th a cash receipt showing a credit of 198.

 5    Do you see that?

 6    A.          Yes.

 7    Q.          What's your understanding of what this

 8    document is?

 9                MR. DOTO:  Objection.  Hold on, Ms.

10    Isenberg.  I'm going to object to the extent that this

11    has already been asked and answered.

12    Q.          Go ahead.  You may answer the question.

13                MR. DOTO:  No.  I'm going to instruct

14    her not to answer the question.

15                MS. KONOPACKA DeSIPIO:  Vinny, unless

16    it is an attorney/client privilege or limitations, I

17    think this is a discovery deposition and that she's

18    entitled to answer this.

19                MR. DOTO:  She was already questioned

20    under oath by Mr. DeBella about this exact document.

21    So, that testimony has been asked and answered.

22                MS. KONOPACKA DeSIPIO:  And I'm

23    asking her if she understands, what her understanding

24    is of this document.

25                MR. DOTO:  She's already been
```

BOBBI-JO ISENBERG

```
 1   questioned about the document and she answered those
 2   questions.
 3                    MS. KONOPACKA DeSIPIO:  So, are you
 4   instructing her not to answer?
 5                    MR. DOTO:  Correct.
 6                    MS. KONOPACKA DeSIPIO:  Okay.
 7   Q.        How did you make payments for your rental
 8   at Apartment 27?
 9   A.        Cash.
10   Q.        Did the authority provide you any type of a
11   receipt every time you paid cash?
12   A.        Yes.
13   Q.        And did you keep those receipts?
14   A.        No.
15   Q.        Did Mr. Wright pay for any of the rent in
16   the year 2020?
17   A.        I'm not sure.
18   Q.        Had he ever paid for any of the monthly
19   rent for Apartment 27?
20   A.        Yes.
21   Q.        You mentioned that Mr. Wright takes care of
22   someone.  What other jobs has he performed during his
23   working career?
24   A.        Um, when I was with him, he worked on
25   houses.  He fixed up bicycles.  Um, he did a number of
```

BOBBI-JO ISENBERG

```
 1    Q.          And when you purchased this property, who
 2    did you purchase it from?
 3    A.          Coldwell Bankers.
 4    Q.          And was this a foreclosure or a Sheriff's
 5    sale?
 6    A.          No.  I found it on Zillow.
 7    Q.          And what was the asking price for the
 8    property?
 9    A.          The asking price was 57,000.
10    Q.          And how much did you pay for it?
11    A.          30,000 cash.
12    Q.          And where did you get the cash from?
13                MR. DOTO:  Objection.  That's been
14    asked and answered, as well.
15    Q.          You can answer.
16                MR. DOTO:  I'm instructing her not to
17    answer.  It's been asked and answered.  That line of
18    questioning came up during the Examination Under Oath
19    with Mr. DeBella.
20    Q.          And did you have a home inspection done
21    prior to purchasing the property?
22    A.          No.
23    Q.          And who was listed on the deed to the
24    property when you purchased it?
25    A.          Myself.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

BOBBI-JO ISENBERG

```
1    finish that formal living room had when you purchased

2    the property in May of 2018?

3    A.        I'm not sure.

4    Q.        And what was the wall finish in that room?

5    A.        I'm not sure.

6    Q.        How about the flooring in that formal

7    living room?

8    A.        It was raised carpet.  I remember that

9    much.  It was green raised carpet.

10   Q.        What do you mean by raised carpet?

11   A.        Um, you know you can buy carpet that is

12   real thin.  This carpet was very thick.

13   Q.        And from the time of purchase up until the

14   time of the fire, did you do any renovations to that

15   formal living room?

16   A.        I did.

17             MR. DOTO:  Objection.  That was asked

18   and answered.  She testified to the work that was done

19   in the living room in the Examination Under Oath.

20             MS. KONOPACKA DeSIPIO:  Are you going

21   to object to every question I ask because it may have

22   been covered in the Examination Under Oath?

23             MR. DOTO:  Correct.  Anything that

24   was covered in the Examination Under Oath.

25             MS. KONOPACKA DeSIPIO:  Let's just
```

BOBBI-JO ISENBERG

```
 1   take a break for five minutes.  It is 12:03 and we'll
 2   be back at 12:08.
 3   A.          Okay.
 4                    (Whereupon, a brief recess was
 5   taken.)
 6                    MS. KONOPACKA DeSIPIO:  We're back on
 7   the record.  It's 12:09.
 8   Q.          Were you in the formal living room on May
 9   13th of 2020?
10   A.          I don't know.  I don't remember.
11   Q.          Were you in the property at all on May 13th
12   2020?
13   A.          Yes.
14   Q.          Can you tell me whether or not there was
15   any work done to the ceiling at that point in time?
16   A.          I honestly don't remember.
17   Q.          Was there a ceiling in the formal living
18   room on May 13th of 2020?
19   A.          I don't remember.
20   Q.          Back on May 13th of 2020, were there any
21   wall finishes in that room?
22                    MR. DOTO:  Objection.  Asked and
23   answered.
24   Q.          You may answer.
25                    MR. DOTO:  No.  I'm instructing her
```

1   not to answer.  That question was specifically asked

2   of her already.

3                    MS. KONOPACKA DeSIPIO:  I did not ask

4   her that question during this deposition at all,

5   Vinny.

6                    MR. DOTO:  She was asked that at her

7   Examination Under Oath.

8                    MS. KONOPACKA DeSIPIO:  That was over

9   a year ago.  I'm not sure if it was asked or it was

10  not asked but I think it is pertinent to the

11  litigation of this case.

12                   MR. DOTO:  And I'm going to instruct

13  her not to answer it.  State Farm already asked her

14  that question and there's no reason to ask it again

15  other than to try and trap her with her own testimony.

16  State Farm has that information.

17  Q.          And how about the floor in that formal

18  living room back in May 13, 2020, was the floor

19  finished in that room?

20                   MR. DOTO:  Same objection.

21                   MS. KONOPACKA DeSIPIO:  Are you

22  instructing her not to answer?

23                   MR. DOTO:  Correct.  I'm instructing

24  her not to answer any questions that she was asked at

25  her Examination Under Oath by State Farm.

```
 1                    MS. KONOPACKA DeSIPIO:  So, are you

 2   attesting to the truthfulness of the answers in the

 3   Examination Under Oath, Vinny?

 4                    MR. DOTO:  Excuse me?

 5                    MS. KONOPACKA DeSIPIO:  Are you

 6   attesting to the truthfulness of the answers at the

 7   Examination Under Oath?

 8                    MR. DOTO:  I'm not attesting to

 9   anything.  She gave an oath at the beginning of the

10   Examination Under Oath.  She was questioned by State

11   Farm and there's no reason for State Farm to re-ask

12   those same questions here today.

13   Q.          Ms. Isenberg, the Examination Under Oath

14   that was taken on September 14, 2020, did you give

15   truthful answers during that Examination Under Oath?

16   A.          Yes, ma'am.

17   Q.          So, what would be the next room after the

18   formal living room that you would have in that house

19   back in May of 2018?

20   A.          If I was to -- the living room was to the

21   right and there was a staircase going upstairs, um,

22   and if you would walk forward, it would be my formal

23   dining room.

24   Q.          So, would the dining room then be on the

25   left-hand side of the doors; the front door?
```

BOBBI-JO ISENBERG

68

```
 1    A.           Yes.
 2    Q.           And what was the ceiling finished material
 3    in the formal dining room back on May of 2020?
 4                        MR. DOTO:  Objection.  Asked and
 5    answered.
 6                        MS. KONOPACKA DeSIPIO:  Are you
 7    instructing her not to answer?
 8                        MR. DOTO:  Correct.
 9    Q.           What were the wall finishes of the formal
10    dining room back in May of 2018?
11                        MR. DOTO:  Objection.  Asked and
12    answered.
13    Q.           And what were the floor finishes in that
14    room?
15                        MR. DOTO:  It's the same objection.
16    Q.           Did you do any renovations in that room
17    from May of 2018 until May 13th of 2020?
18    A.           Yes.
19    Q.           And did you do any renovations to the
20    formal living room from May of 2019 to May 13th of
21    2020?
22    A.           Yes.
23    Q.           And did you do anything to the ceiling by
24    way of renovations in the formal dining room during
25    time of purchase up until the date of the fire?
```

1   A.          Down at the house I slept on my Coleman

2   mattress.  It was like a queen size double mattress.

3   They're really big.  Um, and I found that to be

4   comfortable to sleep on down there.

5   Q.          So, that was at the Pennsylvania Avenue

6   house?

7   A.          Yes.  It was kind of nice because when

8   you're not -- from my understanding of things, you're

9   not supposed to be at your house at night if you don't

10  have running water but I worked all night.  So, it

11  really didn't affect me like it would somebody normal.

12  Q.          And how about Makalah and Aurora?  Where

13  were they sleeping?

14  A.          They would either sleep with me in my

15  mattress bed thing that I had or they would sleep in

16  the cots that they had.  I had wooden cots.  They were

17  like really old old old but they still worked.

18  Q.          How many cots did you have?

19  A.          I had two.

20  Q.          And what kind of cots were these?

21  A.          Wooden.  They were like old fashioned

22  camping style cots.

23  Q.          And Aurora and Makalah, how much time did

24  they spend sleeping at the Pennsylvania property house

25  versus the Apartment 27?

BOBBI-JO ISENBERG

1   A.          Um, it just depended.  I would say

2   approximately sixty percent of the time.  A lot of the

3   times I took my daughters with me.

4   Q.          And how about you?  How much time did you

5   spend sleeping at the Apartment 27 property?

6   A.          I'm gonna say maybe approximately twenty,

7   twenty five percent of the time maybe.

8   Q.          And how about Edward Wright?

9   A.          Edward stayed at the house a lot during the

10  nighttime because he --

11  Q.          Which house?

12  A.          At the apartment at nighttime because he

13  didn't work nightshift.  I did.  And a lot of times I

14  would take my daughter with me to work but he would

15  stay home with Aurora; the baby.

16  Q.          So, you would take Makalah with you to

17  work?

18  A.          Often times, yes.  Towards the end of

19  everything, they both went with me.

20  Q.          So, in 2018 how much time did Ed Wright

21  spend sleeping at the apartment?

22  A.          At nighttime the whole time.  During the

23  day he was at the new house.  He was at the house.  We

24  all were.

25  Q.          When you were doing renovations, what rooms

1  did you actually renovate on the first floor?

2              MR. DOTO:  Objection.  Asked and

3  answered.

4  Q.          Go ahead.  You can answer.

5              MR. DOTO:  No.  I'm going to instruct

6  her not to answer that.

7  Q.          In May of 2020, was the kitchen renovated

8  at all?

9  A.          No.  Only thing was we just did a whole

10  bunch elbow grease and I did took the wallpaper off of

11  the walls.  I sprayed it with vinegar and water and I

12  took it down as much as I could.  I didn't really do

13  too much with the kitchen.  I didn't have enough

14  money.

15  Q.          How about the formal living room?  Was that

16  room completely renovated when the fire occurred?

17              MR. DOTO:  Objection.  Asked and

18  answered.

19  Q.          How about the dining room?  Was that fully

20  renovated when the fire occurred in May of 2020?

21              MR. DOTO:  Same objection.  Asked and

22  answered.

23              MS. KONOPACKA DeSIPIO:  You're

24  instructing her not to answer?

25              MR. DOTO:  Correct.

BOBBI-JO ISENBERG

1   very mean.  So, I kind of tried to stay to myself.

2   Q.          Any other rooms on that first floor besides

3   the formal living room, dining room, the game room,

4   the kitchen and that small bath?

5   A.          Just the stairs to go down to the basement

6   and that was in the room with the half bath and that

7   was it.

8   Q.          And how about on the second floor?  Let's

9   start with the master bed.  Did you tell me whether or

10  not there was a bathroom on the second floor, as well

11  before?

12  A.          No, but there was.

13  Q.          So, just to backtrack, that bathroom on the

14  second floor, can you describe for me what that

15  bathroom looked like in May of 2018?

16                   MR. DOTO:  Objection.  Asked and

17  answered.

18                   MS. KONOPACKA DeSIPIO:  Are you

19  instructing her not to answer, Vinny?

20                   MR. DOTO:  Yes.

21  Q.          And did you do any renovations in that

22  bathroom between time of purchase and date of fire?

23                   MR. DOTO:  Same objection.

24                   MS. KONOPACKA DeSIPIO:  Are you

25  instructing her not to answer?

1                        MR. DOTO:  Yes.

2     Q.          And your master bedroom, Ms. Isenberg, what

3     were the ceiling finishes in the master bedroom at the

4     time that you purchased the property?

5                        MR. DOTO:  Objection.  Asked and

6     answered as to all three bedrooms on the second floor

7     of the home.  I am instructing her not to answer any

8     questions about those because she's already been

9     questioned in length about them.

10                        MS. KONOPACKA DeSIPIO:  Not by me she

11     hasn't.  Not at this deposition, Vinny.

12                        MR. DOTO:  At State Farm she has.

13                        MS. KONOPACKA DeSIPIO:  Not by me and

14     not at this deposition though.  Do you understand that

15     part?

16                        MR. DOTO:  Excuse me?

17                        MS. KONOPACKA DeSIPIO:  I said I

18     haven't asked her those questions during this

19     deposition and during this litigation.

20                        MR. DOTO:  She was questioned by an

21     attorney representing State Farm to that exact topic.

22                        MS. KONOPACKA DeSIPIO:  So, you're

23     instructing her not to answer?

24                        MR. DOTO:  Yes.

25     Q.          Ms. Isenberg, all the materials that you

BOBBI-JO ISENBERG

```
 1   A.          Yes, they did.

 2   Q.          And when was that?

 3   A.          I don't know.

 4   Q.          Can you approximate for me?

 5               MR. DOTO:  Objection.  Asked and

 6   answered.

 7   Q.          You may answer.

 8   A.          I don't know.

 9   Q.          What's the answer?

10               MR. DOTO:  I'm objecting and

11   instructing her not to answer.

12               (Whereupon, the answer was read back

13   by the reporter.)

14   Q.          Ms. Isenberg, you're wearing your mask over

15   your mouth and I'm having trouble hearing you.  Is

16   there somebody in the room with you that you need to

17   put on the mask on?

18   A.          No.

19   Q.          If you can keep the mask off, it's just

20   easier to hear.

21   A.          Okay.

22   Q.          Thank you.

23               MR. DOTO:  Yolanda, before we move on

24   it's 1:30.  Do you know how much longer you anticipate

25   being?  Should we take a lunch break or did you think
```

BOBBI-JO ISENBERG

142

1    Q.         So, who did the electrical?

2                    MR. DOTO:  Objection.  I'm going to

3    object to that as asked and answered and instruct you

4    not to answer.

5    Q.         Was all the electrical completed at the

6    time of the fire?

7                    MR. DOTO:  Same objection.

8                    MS. KONOPACKA DeSIPIO:  Are you

9    instructing her not to answer?

10                   MR. DOTO:  Every time I object as

11   asked and answered, I'm instructing her not to answer.

12   Q.         What was the electrical work that had been

13   done at the property prior to the fire?

14                   MR. DOTO:  I'm not allowing her to

15   answer any questions about the electrical work at the

16   property.

17   Q.         Had you had any plumbing work done at the

18   property?

19   A.         Nope.

20   Q.         Other than Ed and yourself, was there

21   anybody else that came to do any work at the property?

22   A.         I already answered that question.

23   Q.         And what did you say?

24   A.         My Aunt Penny.

25                   MR. DOTO:  Objection.  No more

1    questions about who did work at the property.  That

2    was also a question at the Examination Under Oath.

3    Q.          I think you can still answer.  I don't

4    recall your answer.  You said Aunt Penny?

5    A.          My lawyer is telling me not to answer you.

6    So, I'm not going to.

7    Q.          What is Aunt Penny's background?

8                    MR. DOTO:  Objection.  Asked and

9    answered.

10                   MS. KONOPACKA DeSIPIO:  Are you

11   instructing her not to answer, as well?

12                   MR. DOTO:  Yes.  I already said every

13   time I object as asked and answered, I'm instructing

14   her not to answer.

15   Q.          Any other people that came to do work at

16   the property, what is their background?

17                   MR. DOTO:  Same objection.

18   Q.          Did you ask anybody who did work at the

19   property to pull a permit for you or apply for a

20   permit with the township?

21   A.          I didn't need to.  It wasn't outside of my

22   house.

23   Q.          How is it that you know that you didn't

24   need to pull a permit because what you were doing was

25   not outside your house?  Where did you get that

BOBBI-JO ISENBERG

144

```
 1   information from?
 2   A.          From my family.
 3   Q.          Who?
 4   A.          My Aunt Penny and my uncle.
 5   Q.          Is your Aunt Penny in the construction
 6   field?  Does she work in construction, in other words?
 7   A.          Her son does.
 8   Q.          But she does not?
 9   A.          No.
10   Q.          How about your uncle?
11   A.          She actually owns properties.
12   Q.          How about your uncle?  Does he work in
13   construction?
14   A.          No.
15   Q.          What's Aunt Penny's last name?
16   A.          Metga -- (phonetic.)
17   Q.          What is it?
18                    MR. DOTO:  Objection.  Asked and
19   answered.
20                    MS. KONOPACKA DeSIPIO:  She gave an
21   answer and I didn't hear because you were
22   interrupting.
23                    MR. DOTO:  Because I'm objecting to
24   the question.  It's already been asked and it's
25   already been answered.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

BOBBI-JO ISENBERG

```
 1   Q.           How about your uncle?  What's your uncle's

 2   name?

 3                     MR. DOTO:  Same objection.

 4   Q.           What properties does Aunt Penny own?

 5                     MR. DOTO:  Objection.  That's

 6   completely irrelevant.

 7   Q.           What's Aunt Penny's construction

 8   background?

 9                     MR. DOTO:  Objection.  Completely

10   irrelevant.

11   A.           Ridiculous.

12   Q.           Did you contact anyone at the township to

13   come out and do any inspections?

14   A.           For what?

15   Q.           Based on your renovations.

16   A.           No.

17   Q.           Now your daughter Makalah, back in 2018 was

18   she in school?

19   A.           Yes.

20   Q.           And what school did she attend?

21   A.           New Castle.

22   Q.           That's the name of the school; New Castle?

23   A.           Yes.

24   Q.           Is that grade school, middle school?

25   A.           Grade school.
```

BOBBI-JO ISENBERG

```
 1   Q.        And where is that school located?

 2   A.        New Castle.

 3   Q.        What's the address?

 4   A.        I'm not sure.

 5   Q.        Can you tell me the street?

 6   A.        I'm not sure.

 7   Q.        And in 2019 did she attend that same

 8   school?

 9   A.        Yes.

10   Q.        How about 2020?

11   A.        No.

12   Q.        So, in 2020 where did she go to school?

13   A.        Oh, wait.  She did.  I apologize.

14   Q.        So, in 2020 did she attend New Castle Grade

15   School?

16   A.        I believe so, yes.

17   Q.        How about in 2021?  Did she attend the same

18   school in New Castle Grade School?

19   A.        For part of the year.

20   Q.        What part of the year did she attend at New

21   Castle?

22   A.        Up until December, I believe.

23   Q.        Of 2021?

24   A.        Of 2020, I believe.

25   Q.        So, you told me that in 2020 she was in New
```

1   Castle Grade School and 2021 you said she was at New

2   Castle part of the year.  Then I asked you what part

3   and you said December of 2021.

4   A.          That might be true.  I'm not sure.

5   Q.          Where did she go after New Castle Grade

6   School?

7                   MR. DOTO:  Objection.  It's

8   irrelevant.

9   Q.          I'm sorry.  Where did she go?

10  A.          It's irrelevant.

11                  MR. DOTO:  I'm objecting to that

12  question.

13                  MS. KONOPACKA DeSIPIO:  Vinny, can

14  you please stop talking over top of the witness?

15                  MR. DOTO:  No, I can't.  I'm

16  objecting to the question and instructing her not to

17  answer.

18  Q.          And why did she go to a different school?

19                  MR. DOTO:  Objection.  This bears no

20  relevance.  This is after the loss.

21                  MS. KONOPACKA DeSIPIO:  I'm not so

22  sure that that has anything to do with what you're

23  objecting to because you won't let her answer.

24                  MR. DOTO:  Because it's no relevance

25  to the case.  You don't have the freedom to just ask

BOBBI-JO ISENBERG

148

1    any question you want.  It has no tendency to lead to
2    any facts at issue.
3    Q.          So Ms. Isenberg, do you know whether it was
4    2020 or 2021 that your daughter Makalah spent part of
5    the year in New Castle versus part of the year
6    somewhere else?
7    A.          No.
8    Q.          How far is the Apartment No. 27 from
9    Pennsylvania Avenue; the house that you bought?
10   A.          About three miles.
11   Q.          If you were living either at the apartment
12   or at Pennsylvania Avenue, would Makalah go to the
13   same school?
14   A.          I don't know.
15   Q.          And New Castle Grade School, is that a
16   public school?
17   A.          I believe so.
18   Q.          Did you have to pay any tuition for her to
19   go to school?
20   A.          No.
21   Q.          Now, what grade was Makalah attending in
22   2018?
23   A.          I'm not sure.
24   Q.          And how old was she in 2018?
25   A.          Eight.

BOBBI-JO ISENBERG

1    Q.          Are you using today's date as the period

2    when you say six years ago?

3    A.          No.  Approximately, six years ago.

4    Approximately.

5    Q.          From today's date?

6    A.          Per se, yes.

7    Q.          And since then you had another PFA against

8    him more recent; is that correct?

9    A.          Yes.

10   Q.          And was that in 2019 or 2020, that PFA?

11   A.          I think it was 2020, I believe.

12   Q.          Were you still working on renovating the

13   house when the fire occurred on May 13, 2020?

14   A.          Yes.

15   Q.          And what were you working on renovating at

16   that time?

17   A.          Downstairs and flooring in Makalah's room.

18   Q.          And what were you working on downstairs?

19   A.          Um, finishing up the drywall and getting

20   ready to paint the floor down.

21   Q.          And where were you working on finishing up

22   the drywall?

23                    MR. DOTO:  Objection.  Asked and

24   answered.  That was already asked today.

25   Q.          Were you in the house doing any work on

BOBBI-JO ISENBERG

```
 1    May 13, 2020?
 2                    MR. DOTO:  Objection.  Asked and
 3    answered.
 4    Q.         Was Ed Wright helping you finish the
 5    drywall and put down the flooring in the house in May
 6    of 2020?
 7    A.         He was trying to, yes.
 8    Q.         My question was, was he.  Not was he trying
 9    to.
10    A.         Yes.
11    Q.         So, he was helping you with the renovations
12    in May of 2020?
13    A.         Yes.
14    Q.         And was he doing any work in May of 2020 at
15    the Pennsylvania property?
16    A.         Yes.
17    Q.         And what work was he doing in May of 2020
18    at the Pennsylvania property?
19    A.         He was hanging the rest of the drywall in
20    the formal living -- formal dining room.
21    Q.         And was he doing that to the ceiling, to
22    the walls or both?
23    A.         Walls.
24    Q.         All the walls in the dining room?
25    A.         No.  Some of them are already completed.
```

1   Most of it was completed.

2   Q.          So, how much drywall was he still hanging

3   in the formal dining room in May of 2020?

4   A.          Um, I'm not sure.  There was only a little

5   section that needed to be done as far as the

6   insulation goes and then it was just drywall.  There

7   was like a patch.

8   Q.          So, was he putting in insulation in the

9   formal dining room, as well?

10  A.          Yes.

11  Q.          How much insulation was he putting into the

12  dining room?

13  A.          He had already hung all the insulation up

14  and started hanging the drywall.

15  Q.          And were you helping him with that work;

16  the insulation and the drywall?

17  A.          Yes.  After I had him removed from the

18  property.

19  Q.          So, when did you have him removed from the

20  property?

21  A.          A few months before the fire started but I

22  can't give it an approximate date for when that was.

23  Q.          So, I'm a little bit confused by your

24  answer or answers.  If the fire was on May 13th of

25  2020 and you said you had him removed from the

BOBBI-JO ISENBERG

```
 1   property a couple of months before the fire, you're
 2   also telling me that he was in the property doing
 3   drywall work and insulation in May of 2020 --
 4   A.          Then I'm wrong.  Um, when I put the PFA on
 5   him and I had the police go down there, he was hanging
 6   the drywall and insulation.  I had to finish up what
 7   he did down there when I made him leave.
 8   Q.          And did you do that yourself after he left?
 9   A.          Yes.
10   Q.          And what is it that --
11   A.          Well, I had help with my family.  My family
12   helped me with some of that.
13   Q.          So, who finished the drywall insulation in
14   the formal dining room?
15                    MR. DOTO:  Objection.  Asked and
16   answered.
17   A.          It's been answered.  It wasn't all
18   finished.
19   Q.          What wasn't all finished?
20                    MR. DOTO:  Objection.  Asked and
21   answered.
22   A.          It was answered.
23   Q.          And you had mentioned that you were inside
24   the Pennsylvania property on May 13th of 2020.  Is
25   that accurate?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

BOBBI-JO ISENBERG

```
 1                      MR. DOTO:  Objection.  Asked and
 2    answered.
 3    Q.          Is that accurate?
 4                      MR. DOTO:  It's been asked and
 5    answered.
 6                      MS. KONOPACKA DeSIPIO:  You're
 7    instructing her not to answer again?
 8                      MR. DOTO:  Correct.
 9    Q.          Who was in the property on May 13, 2020?
10                      MR. DOTO:  Asked and answered.
11                      MS. KONOPACKA DeSIPIO:  You know
12    what, Vinny?  Considering your constant objections of
13    asked and answered, I'm just going to terminate the
14    deposition at this time and I will take this up with a
15    motion with the Judge.  And depending on what he
16    rules, we'll resume with those questions and then I
17    can also finish up my questions with respect to the
18    property.
19    Q.          A couple of questions, Ms. Isenberg.  Was
20    this the first property that you ever owned; the
21    Pennsylvania property?
22    A.          Yes.
23    Q.          Have you ever had insurance whether it's
24    renters insurance or any other type of insurance on
25    any property that you lived in?
```

BOBBI-JO ISENBERG

166

```
 1   A.          No.

 2   Q.          And do you own a car or cars?

 3   A.          Yes.

 4   Q.          And who do you have those insured with?

 5   A.          State Farm.

 6   Q.          Have you always had them insured with State

 7   Farm?

 8   A.          Um, yes but I also was -- I was also with

 9   other insurance companies.  State Farm was never my

10   first insurance company.

11   Q.          Was State Farm your last insurance company?

12   A.          Yes.

13   Q.          So, did you have State Farm once before,

14   went to another insurance company and then came back

15   to State Farm?

16   A.          No.

17   Q.          So, when did you first become insured with

18   State Farm?

19   A.          Um, before I bought the house.  I had car

20   insurance through them before I bought the house.

21   Q.          And how long were you insured with them for

22   your cars if you purchased a house in May of 2018?

23   A.          I'm not sure.

24   Q.          And how is it that you decided to insure

25   your home with State Farm?
```

BOBBI-JO ISENBERG

167

1    A.          Because I already had insurance with my

2    vehicles and they do a bundling deal with State Farm.

3    So, I decided to check on that since I was told about

4    that because I was talking to the agent about

5    purchasing a home soon.  And they said, "Well, we do

6    insurance bundling with the car insurance."  And I

7    said, "Well, that's great.  I'll keep you in mind when

8    I go -- if I purchase the home."

9    Q.          And who is the agent that you were speaking

10   with?

11               MR. DOTO:  Objection.  Asked and

12   answered.

13               MS. KONOPACKA DeSIPIO:  Okay.  You

14   know what?  Vinny, we're just going to call it quits

15   here.  I'll terminate the deposition and we'll resume

16   it at a later time.  I'll have to resume it for the

17   conference anyway.

18               Ms. Isenberg, thank you very much for

19   your time.  I'm going to end the deposition at this

20   time based on your Counsel's objections and depending

21   on how the Judge rules, I'll resume the deposition on

22   your contents at a later time.  At which time I will

23   cover anything that the Judge allows me to get into,

24   as well.  But thank you for your time today.

25               MR. DOTO:  With the exception of the

BOBBI-JO ISENBERG

1    contents that were already questioned.

2                        (Whereupon, the Examination concluded

3    at 3:27 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**